FILED

2013 May-29  AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **MARY BILLINGSLEY, FANNIE THRASH, on behalf of themselves and all other similarly situated,** ] ] ] ] | |
| **Plaintiffs,** ] ] | |
| **v.** ] ] | **4:12-CV-0627-KOB** |
| **CITI TRENDS, INC.,** ] ] | |
| **Defendant.** ] | |

## MEMORANDUM OPINION

This Fair Labor Standards Act case presents the court with a dilemma: enforce arbitration agreements against Defendant Citi Trends Store Managers, who are potential opt-in Plaintiffs in this collective action that were obtained during the conditional certification stage of this case and gut the collective action mechanism Congress provided for the protection of employees *or* refuse to enforce the arbitration agreements and run afoul of the federal policy favoring their enforcement. Because of the particular events surrounding the roll-out of the arbitration agreement in this case, as specifically discussed below, the court finds it cannot approve employer conduct like that involved in this case specifically targeting only potential class members during a critical juncture in this case with the definite goal of undercutting the Congressional intent behind the collective action process. The court will DENY the Defendant's motion to compel arbitration and preserve the viability of the collective action mechanism.

I.      Procedural Background

This matter comes before the court on the "Defendant's Motion for Reconsideration of the Court's Oral Order Prohibiting Arbitration and to Compel Arbitration against Opt-ins who

are subject to Arbitration Agreements." (Doc. 60). The Plaintiffs, Citi Trends Store Managers,  in this FLSA collective action claim that Citi Trends improperly designated the Store Managers as exempt employees when they should have been designated as hourly employees and paid overtime. The court conditionally certified the collective class on January 23, 2013 but has not yet approved notice to Citi Trends Store Managers because of the Defendant's motion to reconsider.

Defendant Citi Trends, Inc. argues that this court's ruling at the January 2013 hearing that it could not seek to compel arbitration against those opt-in Plaintiffs who signed mandatory arbitration agreements was an error of law. The Plaintiffs argue that the court's ruling was appropriate and necessary to correct Citi Trends's  wrongful action—intimidating its employees into waiving their rights to join this lawsuit by signing mandatory arbitration agreements. On April 19, 2013, the court granted the motion to reconsider its ruling and set an evidentiary hearing to hear evidence surrounding presentment of the arbitration agreements to determine if any coercion, duress, or intimidation occurred.

In its brief supporting its motion to reconsider and compel arbitration, Citi Trends argues that the court has not made the requisite evidentiary finding to limit Citi Trends's communications with its employees and that the Agreement is enforceable under Georgia law. The Plaintiffs responded, arguing that under its managerial responsibility for ensuring fair notice to the class, the court has the duty and the responsibility to oversee the FLSA collective action; to prohibit the kind of conduct that Citi Trends employed in this case; and to declare the Agreements invalid as they impact this action.  The court recognizes that these arguments create two separate issues and will address the evidence presented at the hearing under both legal

2

theories because the court finds that they both apply to this case.

II.    Background Information

       This motion exclusively concerns a very discrete moment in time when Citi Trends had

all of its then-employed Store Managers ("SMs") sign the Citi Trends Arbitration Agreement

("the Agreement"). (Doc. 47-6). Citi Trends presented the SMs with three documents at the time

it had the SMs sign the Agreement: the Store Manager Disclosure (doc. 47-2); the Store Manager

Declaration (doc. 47-4); and the Agreement. (Doc. 47-6).  The pertinent portions of the

Agreements are set out below:

> In consideration of the foregoing, and for other good and valuable consideration,
> the receipt and sufficiency of which is hereby acknowledged, you and the
> Company agree as follows:
>
> **1.**    **The Mutual Agreement to Arbitrate: Overview**
> Except for the claims set forth in the paragraph below, you are
> required to arbitrate any and all disputes, claims, or controversies
> ("claim") against the Company that could be brought in a court
> including, but not limited to, all claims arising out of your
> employment and the cessation of employment, including any claim
> that could have been presented to or could have been brought
> before any court. This Agreement to arbitrate includes . . . the Fair
> Labor Standards Act . . . . Likewise, the Company has a reciprocal
> obligation to arbitrate any covered claim against you and also
> agrees to be bound by the terms of this Agreement regarding any
> matter covered herein. . . .
>
> **3.**    **Class/Collective Action Waiver**
> This Agreement requires all claims to be pursued on an individual
> basis only. You and the Company hereby waive all rights to (I)
> commence, or be a party to, any class, representative or collective
> claims or (ii) jointly bring any claim against each other with any
> other person or entity. . . .
>
> **4.**    **Severability and Related Issues**
> The Arbitrator, and not any federal, state or local court or agency,
> shall have exclusive authority to resolve any dispute relating to the

3

interpretation, applicability, enforceability or formation of this Agreement including, but not limited to, any claim that all or any part of this Agreement is void or voidable . . . .

**5.**     **Consideration**
In additional to the consideration being a mutual Agreement to arbitrate, the Company agrees to reimburse you for any administrative filing fees the arbitration firm may impose on you to initiate arbitration. As further consideration, the Company will pay 100% of the arbitration firm's fees as well as the arbitrator's fees and expenses. **To the extent permitted by applicable law, your continued employment and/or your accepting employment with the Company subsequent to this Agreement's implementation also shall constitute consideration and acceptance by you of the terms and conditions set forth in this Agreement**. . . .

**7.**     **Other Issues**
   **e.**     **No Employment Agreement/ Employment At Will**
The terms and conditions described in this Agreement are not intended to, and shall not, create a contract of employment for a specific duration of time. Employment with the Company is at-will and voluntarily entered into and both you and the Company are free to end that relationship at any time, for any reason and with or without prior notice.

   **f.**     **Condition of Employment**
It is a condition of your employment by the Company that you agree to be bound by the terms of this agreement. . . .

**I KNOWINGLY AND FREELY AGREE TO THIS MUTUAL AGREEMENT TO ARBITRATE CLAIMS, WHICH OTHERWISE COULD HAVE BEEN BROUGHT IN COURT. I AFFIRM THAT I  HAVE HAD SUFFICIENT TIME TO READ AND UNDERSTAND THE TERMS OF THIS AGREEMENT AND THAT I HAVE BEEN ADVISED OF MY RIGHT TO SEEK LEGAL COUNSEL REGARDING THE MEANING AND EFFECT OF THIS AGREEMENT PRIOR TO SIGNING. BY ISSUANCE OF THIS AGREEMENT, THE COMPANY AGREES TO BE BOUND TO ITS TERMS WITHOUT ANY REQUIREMENT TO SIGN THIS AGREEMENT.**

(Doc. 47-6) (emphasis in original).

4

As the court has previously noted, the evidence in the form of sworn declarations and affidavits submitted by the parties prior to the hearing on the motion for conditional certification of the class created two contrasting and irreconcilable accounts of the communications and atmosphere surrounding the SMs' execution of the Agreement. Because of the hotly disputed nature of the evidence, the court decided to hear testimony from both sides about what occurred when the SMs met with a Citi Trends Human Resources Representative and a supposedly independent third party to sign the Agreement and two other documents directly related to this lawsuit: the Store Manager Disclosure and the Store Manager Declaration.

In the memorandum opinion denying the motion to strike and for entry of protective order (doc. 51) and at the hearing on the motion for conditional certification of the class (doc. 55), the court noted that it could not find that a clear record of misleading communication and unabashedly deceptive activity existed so as to justify limiting Citi Trends's  communications with its employees. Courts have usually only placed limitations on the enforceability of pre-certification (but post-litigation) communications when the court has held an evidentiary hearing where a clear record was developed and specific findings were made or when the court relied on only undisputed facts to make its ruling to invalidate opt-outs or arbitration agreements. *See Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193 (11th Cir. 1985); *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005); *Williams v. Securitas Security Serv. USA, Inc.*, 2011 U.S. Dist. LEXIS 75502 (E.D. Pa. 2011) (all limiting post-litigation communication between parties after a record finding of misleading or abusive communication).

This high standard had not been met on the parties' submission alone, and thus, the court

decided it needed to hold a hearing to determine if any coercion, duress, intimidation, or other abusive conduct occurred at the time SMs were required to sign the Agreement. The question of enforcement of or invalidation of the Agreement invokes a different standard than did the motion to strike or to enter a protective order, which was the requested relief before the court previously. (*See* Doc. 42).

III.   Evidentiary Hearing

At the evidentiary hearing on May 14 and 15, 2013, the court heard testimony from opt-in Plaintiffs Roilisa Prevo and Katina Alfred, former Citi Trends SMs; Ivy Council, Executive Vice President of Human Resources for Citi Trends; Rashad Luckett, Human Resources Coordinator for Citi Trends; Vanessa Davis, Director of Human Resources for Citi Trends; and LaKesha Wilkins, an "independent third party witness" hired by Citi Trends to sit in SM meetings with Ms. Davis. The court will briefly summarize that testimony here but will also reference it as needed in the discussion below.

Citi Trends devised and implemented its new ADR policy in the late spring and early summer of 2012—shortly after it was served with the complaint on February 27, 2012 (doc. 6), and after the court on May 16, 2012, set a scheduling conference for May 31, 2012. (Doc. 17). On May 31, 2012, this court issued a Scheduling Order requiring the Plaintiffs to file their motion for conditional certification of the class on or before July 31, 2012 with briefing to be completed by September 10, 2012. (Doc. 18). Just a couple weeks after the Order, in mid-June, Citi Trends began the process of rolling out its new Alternative Dispute Resolution ("ADR") plan, including the mandatory Agreement. Ms. Davis testified that as of mid-June she had virtually completed the new employee handbook she was working on, which did not include an

6

ADR policy; she learned for the first time in mid-June that the updated handbook would include

the new ADR policy. Citi Trends, under the direction of Ms. Council, sent Ms. Davis, Mr.

Luckett, and other HR representatives to have two-on-one private meetings with SMs across the

country as early as June 30, 2012 to roll out the new ADR policy. The HR representatives met

with all SMs individually throughout the summer.

District Managers ("DMs") told the SMs that they must attend the meetings that

concerned the issuance of a new employee handbook.  DMs were only asked to sign the

Agreement if the HR Representatives happened to see them at the SM meetings, but Citi Trends

distributed the Agreement to DMs, other corporate employees, and store associates at a later date.

When the SMs arrived at the meetings, they were greeted by an HR Representative and

another individual, who Ms. Prevo claimed was never introduced to her and whom Ms. Alfred

identified as another Citi Trends corporate employee. The HR Representatives gave the SMs four

documents:  the SM Disclosure, the Agreement, the SM Declaration, and a photocopied version

of a new employee handbook. The two-on-one private meetings took place in small, back rooms

in Citi Trends retail stores, the same places where interrogations or investigations of employees

occurred. The HR Representatives who met with the SMs played an advisory role in the

employment decisions of Citi Trends employees, and both Ms. Prevo and Ms. Alfred testified

that they believed the HR representatives conducting the meetings had authority to make

employment decisions about them, such as hiring and firing.

Ms. Alfred and Ms. Prevo testified that they signed the documents but came away from

those meetings having felt intimidated by the HR Representatives and pressured to sign the

Agreement or lose their jobs. The SMs were not given copies of the documents they signed at the

7

meeting or at anytime afterward, even if they specifically requested copies.

IV.    Legal Discussion

Although neither party raised the Severability clause of the Agreement as a bar to this

court's enforcement of the Agreement, the court notes that it has the authority under the

Agreement to determine "the enforceability of the class/collective action waiver" under the

Agreement itself. (Doc. 47-6, at 2).  The Agreement states

> The Arbitrator, not any federal, state or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to, any claim that all or any part of this Agreement is void or voidable. However, *any determination as to the enforceability of the class/ collective action waiver shall be made solely by a court.* If a court deems the class/collective action waiver unlawful, then such action shall proceed forward in court as a collective, representative, or class action.

*Id.* (emphasis added).

By its terms, Georgia law controls the Agreement, and under Georgia law,

unconscionability, which could invalidate the agreement, is divided into two components:

procedurals and substantive.

> 'Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves.' Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, 'the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice.' As for substantive unconscionability, courts consider 'the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.'

*Jenkins v. First Am. Cash Advance of Georgia, LLC*, 400 F.3d 868, 875-76 (11th Cir. 2005) (quoting

*NEC Techs., Inc. v. Nelson*, 478 S.E.2d 769, 771-72 (Ga. 1996)).

A.    Unconscionability

    1.    Procedural Unconscionability

        a.    Bargaining Power

First, as to the bargaining power of the parties, Ms. Council summed it up at the hearing when she stated, "It doesn't apply here." The court agrees: the SMs had absolutely no bargaining power when Citi Trends presented the Agreements to them. Thus, the court will not spend much time discussing it.

        b.    Conspicuousness and Comprehensibility of the Contract Terms

The second factor is the conspicuousness and comprehensibility of the contract language. The court finds that the key components of the Agreement are indeed comprehensible and conspicuous. The language itself is conspicuous and clear, particularly the provisions that are most relevant to the issues at hand. The court heard much testimony and discussion about paragraphs 5 and 7(f), both excerpted above. Those terms were conspicuous and comprehensible. Taking that language in connection with the language in the Store Manager Disclosure that declared that the Agreement is mandatory, the SMs to whom the Agreement was submitted understood that the Agreement was a requirement of their employment. Ms. Council testified to the fact that the Agreement was mandatory and binding. Ms. Davis also confirmed that "mandatory" as used in the Disclosure and Agreement means "required." Ms. Davis also testified, as did Ms. Prevo and Ms. Alfred, that they understood that if a SM did not comply with the required policy, the SM would be terminated.

However, the testimony was also clear that Citi Trends did not disclose to the SMs that the company had decided to defer until after the resolution of this lawsuit any decision about the

9

effect on an SM's employment if that SM refused to sign the Agreement. Without that disclosure, the reasonable and logical conclusion for an SM to reach was the understanding that he or she would be terminated from employment if he or she refused to sign the Agreement that was presented by Citi Trends. Thus, the language was conspicuous and comprehensible, but a key component in the understanding of the operation of that document was not disclosed to the SMs.

<u>c.</u>     Oppressiveness of the Terms

The third factor that is relevant for consideration of whether the Agreement is procedurally unconscionable is the oppressiveness of the terms of the Agreement. The court finds that the terms on their face are not any more oppressive than the terms of most such arbitration agreements found in the employment context. It does at least transfer the costs of arbitration from the employee or from a joint obligation to the employer. However, the Agreement cannot be taken out of the context in which it was executed.

In this case, the SMs were ordered by their supervisors, DMs, to attend a meeting with a Citi Trends Human Resources representative. The meeting was held, not in a group setting as was generally done, and in fact done in 2009 with the roll-out of the new employee handbooks, but in a private two-on-one setting. Such a setting, according to Ms. Alfred and confirmed by Ms. Davis, was the kind of private meeting that was generally used in an interrogation or investigation of a Citi Trends employee. The HR Representatives conducting the meetings were the very people whom the SMs would contact regarding employment issues of employees under their supervision. They were also the very people that DMs would consult about employment decisions concerning SMs. The presentation to the SMs of a mandatory arbitration agreement by an HR representatives with reasonably perceived authority over an SM's employment in a small

10

room normally reserved for interrogation infuses the entire process with oppressiveness.

Although Ms. Council testified that HR representatives are only involved as advisors in employment decisions, in this context, the court finds that it was reasonable that SMs would assume that these HR representatives had involvement or at least participation in decisions affecting their employment. The court finds that this belief was reasonable in light of the testimony of Ms. Alfred and Ms. Prevo. Both opt-in Plaintiffs testified that they believed HR had control over their employment based on the HR representatives' involvement in employment decisions. Most notably, none of the documents presented to the SMs said that HR did not have control over the SMs' employment, nor did Ms. Council instruct the HR representatives to advise the SMs that they did not have any involvement in employment decisions.

d.   Presence or Absence of Meaningful Choice

The fourth factor to consider is the presence or absence of meaningful choice. The Agreement itself gave SMs no meaningful choice. The sections excerpted above clearly state that the Agreement is a condition of employment and that the employee agrees to be bound by the Agreement.[1] No dispute exists that Citi Trends never told SMs they did not have to sign the Agreement: not through the HR Representatives; not in the Disclosure; not in the Agreement itself. Ms. Davis's testimony confirmed that a reasonable reading of the documents presented to the SMs would lead them to conclude that their continued employment was conditioned on signing the Agreement. That is, if SMs did not sign the mandatory, *i.e.*, *required,* Agreement, they would lose their jobs.

---

[1] Some might argue that paragraph 5 could be read as binding employees simply by accepting continued employment, even if they do not sign the agreement. The court does not rule on that contention but merely points out that this is an arguable interpretation of the Agreement.

e.      Context

In considering the procedural unconscionability of the Agreement, the court will add a fifth factor to those considered by Georgia courts because it is particularly relevant here: the context under which the Agreement was procured. The court finds to be highly coercive that the two-on-one meetings were conducted by an HR Representative, who the SMs reasonably perceived to be involved in the employment decision-making process because SMs had to discuss employment decisions with them. The Agreement was presented for the SMs' signature in an interrogation-like setting; both Ms. Alfred and Ms. Davis testified that one-on-one private meetings in a back room were the way Citi Trends usually conducted interrogations or investigations. These facts support the likelihood that SMs in fact felt intimidated, coerced, and that they had no choice but to sign the agreement and give up any right to participate in this collective action or be terminated.

Another aspect of the context surrounding the signing of the agreement which supports a finding of procedural unconscionability is that the ADR plan was rolled out in the summer of 2012, four months after Citi Trends was served in this lawsuit. The court notes that in Ms. Council's declaration, she stated:

> Over the last few years, Citi Trends has experienced rapid growth and expansion in both the number of locations it operated and the number of people it employs. As a result of this growth and *well before the store manager wage and hour lawsuit was filed* - as a means of reigning [sic] in and better anticipating legal expenditures- the company began evaluating possible company-wide alternative dispute resolution programs . . . . While this evaluation process was ongoing, the present store manager wage and hour lawsuit was filed.

(Doc. 47-1) (emphasis added). The court finds it particularly telling that Ms. Davis, whose job it

12

was to update the handbook, testified that no one discussed including an ADR policy in the new handbook until mid-June 2012, when the handbook revision on which she was working had already virtually been completed, and only two weeks before the Agreements were presented to all SMs in a blitzkrieg fashion.

The timing of Citi Trends's roll-out of the Agreements becomes even more significant in view of the events in this litigation. The court held a scheduling conference in this case on May 31, 2012 and after receiving input from counsel, entered a preliminary scheduling order in mid-June. (Doc. 18). The June 14, 2012 Order provided, among other things, that the Plaintiffs were to file their motion for conditional certification and court-approved notice on or before July 31, 2012, and that the Defendant was to submit its response with any supporting evidence on or before August 30, 2012. On a consent motion to allow the Plaintiffs an extension of time in which to file their motion for conditional certification, the court extended the time the Plaintiffs had to file the motion until August 2, 2013. (Doc 22). The court specifically notes these dates because it was only after the court held the scheduling conference discussing when the Plaintiffs' motion for conditional certification would be filed that the Defendant began the process of modifying its handbook to include the ADR procedure and to then roll out the ADR plan— not to all of its employees but only to SMs who were potential members of the class involved in this lawsuit.

Also, a cursory review of the exhibits that the Defendant filed in opposition to the motion for conditional certification of the class reflected that the earliest meeting with a SM occurred on June 30, 2012. (Doc. 34-13). The court finds the timing of the roll-out of the ADR policy targeting only SMs was more than just a coincidence, more than just the usual process of

updating and rolling out a new employee handbook.

Several other factors in addition to the suspicious timing of the ADR roll-out support the court's finding that the ADR roll-out was a hurried reaction specifically targeted at curtailing this litigation. The employee handbooks that were distributed at the SM meetings were photocopied as opposed to the printed versions that were normally distributed to Citi Trends employees when the company issued a new employee handbook. Citi Trends presented the SMs printed versions of the new handbook sometime later and required the SMs to sign for them at that time, like all other Citi Trends employees. However, the SMs were not required to sign for the photocopied handbooks at the two-on-one meetings that were purportedly set up to discuss the new handbook. Additionally, the DMs were only presented with the Agreement and photocopied version of the updated handbook if the HR representative happened to see them when they were conducting the SM meetings. Citi Trends distributed the Agreement to the DMs and other Citi Trends employees at a later date. These and other facts that are discussed throughout the opinion point to a finding that Citi Trends rolled out the ADR policy and accompanying Agreement when it did and how it did in direct response to this lawsuit and in a concerted effort to derail the collective aspect of it.

Another aspect of the context surrounding the signing of the agreement that supports a finding of procedural unconscionability is that the documents themselves demonstrate that the Agreement was a mandatary condition of employment and binding on the SMs. Notably, though, no one told the SMs that the company had already decided to defer, until after the resolution of this lawsuit, any decision about the employment status of any SM who refused to sign the Agreement. The court must consider that Citi Trends specifically withheld from the SMs that

refusal to sign the Agreement would not immediately result in any adverse employment action.

The language of the Agreement itself stated that it was a condition of employment and without knowing that the company would not immediately terminate an SM's employment if he or she did not sign or that a decision would be deferred pending the outcome of this lawsuit, one can reasonably infer that Citi Trends anticipated that the SMs would feel just the kind of pressure and coercion that Ms. Prevo and Ms. Alfred testified forced them to sign the Agreement. The court believes that if Citi Trends's  failure to disclose this crucial information to the SMs does not qualify as deceit, it certainly borders on it.

This misleading lack of communication by Citi Trends factors into the overall context in which Citi Trends presented the Agreement to its SMs and is one of many factors that leads the court to conclude that procedural unconscionability is rampant within the presentment of the Agreement and the procurement of the SMs' signatures on it.

Under Georgia law, the court must make a finding of both procedural unconscionability and substantive unconscionability to invalidate the Agreements. Having determined that the Agreement is replete with procedural unconscionability, the court will now address whether it is also substantively unconscionable.

2.      <u>Substantive Unconscionability</u>

a.      <u>Commercial Reasonableness of the Terms</u>

The first factor to consider is the commercial reasonableness of the contract terms. As previously discussed, on the face of the agreement, the terms themselves are reasonable. However, this factor is only one of four for the court to consider.

b.      Purpose and Effect of the Terms

The second factor for the court to consider is the purpose and effect of the terms of the Agreement. Ms. Prevo testified that Ms. Davis told her in the SM meeting that the Agreement was for the protection of Citi Trends, who had been sued in this lawsuit. Regardless of whether Ms. Davis actually made that statement, the documents themselves reflect that the purpose and effect of the terms of the Agreement were designed to protect Citi Trends in this lawsuit.

Paragraph 7(f) of the Agreement specifically states that the Agreement is a condition of employment, and paragraph 7(e) emphasizes that the SM's employment is at will. The inclusion of these provisions emphasizes the perception that the SMs had no choice but to sign the agreement if they wanted to keep their jobs. As stated in the SM Disclosure, an SM signing the Agreement specifically precluded a SM from opting-in to this lawsuit.

The rolling out of the ADR plan in the summer of 2012 that coincided with the court's issuance of a scheduling order in this case and the rushed nature of the distribution of the photocopied handbooks only to SMs supports the finding that the handbook itself was a pretext for presenting the Agreement to the SMs to derail their participation in this lawsuit. These facts demonstrate that the purpose and effect of the terms of the Agreement presented to the SMs in the context in which it was presented was to interfere with and preclude the SMs' participation in this collective action.

c.      Allocation of Risk Between the Parties

The third factor for the court to consider in determining whether the Agreement is substantively unconscionable is the allocation of risk between the parties. The benefits to Citi Trends here are obvious. The Agreement was specifically designed to protect Citi Trends. Its

16

timing was calculated to reduce or eliminate the number of collective action opt-in Plaintiffs in this case. The risks for Citi Trends are de minimis, if any. On the other hand, the SMs had to choose, to the best of their knowledge, between signing the Agreement and keeping their jobs or refusing to sign, participating in this lawsuit, and being terminated.  Conversely from Citi Trends, the benefit to SMs of signing the Agreement was de minimis, if any.

d.    Public Policy Concerns

The fourth and most critical factor for the court to consider in determining whether the Agreement is substantively unconscionable is the existence of any public policy concerns surrounding the Agreement. Again, the context surrounding the presentment of the Agreement plays a key role in the court's analysis. The SM meetings took place four months after this lawsuit was filed, around the same time the court issued a scheduling order, and in the midst of the Plaintiffs' preparing to file their motion for conditional certification of the class and the issuance of court-approved notice.

The Agreement, Disclosure, and SM Declaration were presented in a way that could be perceived as, and in the court's opinion were designed to be, intimidating and coercive. The documents were presented by people who were known to the SMs to play a role, even if only an advisory role, in employment decisions at Citi Tends. The documents disclosed that the Agreement was mandatory, and the testimony of both Ms. Council and Ms. Davis confirmed that the Agreement was in fact mandatory, which by all the witness' understanding means "required." Citi Trends essentially forced its SMs to choose between their jobs and their right to participate in this collective action before they even received approved notice of their opportunity to do so.

The biggest public policy concern that the court has to consider about actions of Citi

Trends, however, is the effect of the Defendant's efforts on the purpose of an FLSA collective action. The court's decision on this issue is bigger than this one case, and that concern is what has plagued the court about this situation from the first mention of the Agreement. The purposes of the FLSA and its collective action procedure factor into the court's decision on this motion.

Congress passed the FLSA during the Great Depression to protect workers from overbearing practices of employers with greatly unequal bargaining power over them. *See Roland Elec. Co. v. Walling*, 326 U.S. 657, 668 n. 5 (1946) ("The Bill was introduced May 24, 1937, [and] . . . accompanied by a Presidential message by Franklin D. Roosevelt . . . .'to protect the fundamental interests of free labor and a free people we propose that only goods which have been produced under conditions which meet the minimum standards of free labor shall be admitted to interstate commerce. Goods produced under conditions which do not meet rudimentary standards of decency should be contraband and ought not to be allowed to pollute the channels of interstate trade.'") (quoting 81 Cong. Rec. 4960, 4961). To further that purpose, § 216(b) of the FLSA authorizes an employee to file suit for and on behalf of himself and others similarly situated. *See* 29 U.S.C. § 216(b). Those employees who wish to join the lawsuit must give written consent or opt-in to the lawsuit, but they only know that they can do so once court-approved notice has been sent to them. *See id.*

Unfortunately, little legislative history exists to aid district courts in managing an FLSA collective action. *See Maddox v. Knowledge Learning Corp*., 499 F. Supp. 2d 1338, 1341 (N.D. Ga. 2007) ("Unfortunately, Section 216(b) gives little guidance as to the exact nature of a 'collective action' or the appropriate procedure for gathering the necessary written consents."); *Sperling v. Hoffmann-LaRoche, Inc.*, 118 F.R.D. 392 (D.N.J. 1988) (finding statute and

18

legislative history "wholly silent" on issue of notice and court involvement), *aff'd in part and dismissed in part*, 862 F.2d 439 (3rd Cir. 1988), *aff'd,* 493 U.S. 165 (1989); *Shushan v. University of Colorado*, 132 F.R.D. 263, 266 (D. Colo. 1990) (finding statute "vague" and legislative history "equally unilluminating").

The Supreme Court, however, in *Hoffman-LaRoche, Inc. v. Sperling* stated the purposes of an FLSA collective action, and the Eleventh Circuit re-stated these purposes in the seminal case of *Morgan v. Family Dollar*:

> Addressing whether Plaintiffs' claims could be tried fairly as a collective action also requires looking to the purposes of § 216(b) actions under the FLSA: (1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct. *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (noting a collective action affords plaintiffs the "advantage of lower individual costs to vindicate rights by the pooling of resources" and "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact").

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008). Such goals cannot be met without the district court managing the process of notification and joinder of additional parties.  This court must consider these public policy purposes as a backdrop to every decision made in an FLSA collective action.

In  this case, the court finds that such goals are defeated if the court approves actions taken by defendants, such as those taken by Citi Trends in this case, that are designed and used to prevent employees from vindicating their rights in an FLSA collective action. The court wishes to make clear that it is not addressing a pre-lawsuit or pre-employment arbitration agreement between an employer and employee that would preclude participation in a collective action. Instead, this ruling only addresses the Agreement in this case that was presented to the

specifically-targeted potential class of employees in the specific manner that gave those potential

opt-in Plaintiffs no meaningful choice or known opportunity to refuse to sign without the fear of

termination in a setting that was ripe for and calculated to produce perceived intimidation or

coercion and when its very purpose and effect was to preclude participation in this lawsuit.

For these reasons, the court finds that the Agreement at issue in this case reeks of both

procedural and substantive unconscionability in the context in which it was presented and

obtained. The Agreement cannot and will not be enforced against Ms. Prevo, Ms. Alfred, or Ms.

Cunningham, and the court will DENY Citi Trends's  motion to compel arbitration against them.

In making this decision, the court notes that it found the testimony presented by the Defendant,

specifically that from Ms. Council and Ms. Davis, particularly enlightening. In addition to the

language of the documents themselves, the court finds that the concurrent timing of the ADR

roll-out and the Plaintiffs' preparation of the motion for conditional certification and court

approved notice, and the manner in which the Agreement was presented weigh in favor of

invalidating the Agreement as it relates to the SMs who were presented the Agreement during its

initial roll-out in the summer of 2012.

The court truly believes it would be a derogation of the court's responsibility if it were to

approve employer conduct like that in this case that specifically undercuts the Congressional

intent behind creating the FLSA collective action process for aggrieved employees, and the court

does not take such action lightly.

B.    Managerial Discretion over FLSA Collective Action

The court also agrees with the Plaintiffs that the court has managerial responsibilities that

provide at least alternative grounds for its ruling. Under *Hoffman-La Roche*, this court "has a

managerial responsibility to oversee the joinder of additional parties" to assure that a FLSA

collective action is run "in an efficient and proper way." *Hoffman-La Roche, Inc.,* 493 U.S. at

171.  "[D]istrict courts are empowered with relatively broad discretion to limit communications

between parties and putative class members," but defendant employers are not "categorically

forbidden from communicating with prospective opt-in plaintiffs." *Longcrier v. HL-A Co.,* 595 F.

Supp. 2d 1218, 1225 (S.D. Ala. 2008) (citing *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d

1193, 1201-03) (11th Cir. 1985)).

The Supreme Court has held that district courts "may not exercise the power [to limit

communication] without a *specific record* showing by the moving party of the particular abuses

by which it is threatened" and must give "explicit consideration to the narrowest possible relief

which would protect the respective parties." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 (1981)

(emphasis added) (citation omitted). "[A]n order limiting communications between parties and

potential class members should be based on a *clear record and specific findings* that reflect a

weighing of the need for a limitation and the potential interference with the rights of the parties."

*Id.* at 101 (emphasis added). Although the *Gulf Oil* standard applies for parties seeking a

protective order, the court finds it useful as guidance in a situation like this one: where the

abusive communication has already occurred without the court's knowledge and the court must

remedy the effect of such abusive communication.

This court specifically ruled in its previous memorandum opinion on the Plaintiffs'

motion to strike that it did not find that a "clear record of 'misleading communication' and

'unabashedly deceptive activity'" existed. (Doc. 47, at 10 (quoting *Longcrier*, 595 F. Supp. 2d at

1228). This court did express concern over the "environment in which the Store Managers signed

21

the mandatory arbitration agreements waiving their right to opt-in to the case" and recognized

that "a unilateral communication scheme . . . is rife with *potential* for coercion." (Doc. 47, at

10); *Kleiner*, 751 F.2d at 1202.

After the evidentiary hearing, the court does find such a showing. As previously

discussed, the court now has the evidence it lacked when simply reviewing the parties'

submissions. After hearing testimony presented by both parties, the court finds not only a

*potential* for abuse but a *record* of abuse on the part of Citi Trends in targeting potential class

members and procuring the signatures of its SMs on the Agreements. The court need not repeat

the testimony it cited for the conclusion that the arbitration agreement is both substantively and

procedurally unconscionable; that same evidence informs the court's ruling that Citi Trends's

action went too far and that the court must take corrective measures to ensure that the conduct of

Citi Trends does not thwart the purposes of the FLSA collective action process.

Therefore, under both contractual unconscionability and the managerial responsibility to

oversee joinder of plaintiffs in collective actions, the court finds that the Agreement should not

be enforced against opt-ins Katina Alfred, Roilisa Prevo, and Diedra Cunningham as Citi Trends

seeks, and the court will DENY the Defendant's motion to compel them to submit their claims to

arbitration.

As to other SMs who signed agreements during the ADR roll-out that the court has found

to have been designed and implemented to derail the collective action process and presented in a

fashion that was replete with deceit and intimidation and devoid of any true choice, something

must be done to protect the integrity of the process. The court has a responsibility and a duty to

ensure the fair and proper joinder of all SMs who may wish to opt-in to this lawsuit despite

having signed the Agreement that they thought was a condition of their continued employment.

The court had originally thought that the notice to potential class members should allow for anyone who wanted to opt-in to provide an affidavit about whether intimidation or coercion caused them to sign the Agreement. But now, after hearing testimony, especially from the Defendant's own witnesses, the court finds that such an affidavit is unnecessary. The evidence presented in the hearing convinced the court that the purpose of the Agreement and rolling it out in the hurried and coercive fashion previously discussed was to protect Citi Trends and circumvent the court's oversight of the collective action mechanism. The appropriate remedy for such conduct must go further than the court was prepared to go.

The only way the court knows to protect the public policy behind the FLSA collective action process from being decimated by practices such as those employed by Citi Trends is to rule that the Agreement cannot be enforced against any Citi Trends SM who signed the Agreement during the summer of 2012 while employed as a SM and who wants to opt-in to this lawsuit, and the notice so shall state. Any SM who signed the Agreement as a part of the hiring process after the completion of the ADR roll-out in approximately September 2010 and not in a private two-on-one meeting conducted as part of the roll-out shall still be subject to the terms of the Agreement. This ruling does not affect the enforceability of the Agreement in any other context, nor does it in anyway reflect on the enforceability of a similar mandatory arbitration agreement obtained by an employer prior to the filing of an FLSA collective action.

## IV.   Conclusion

In accordance with its oral ruling at the hearing on May 15, 2013, the court will DENY the Defendant's motion to compel arbitration and will rule that the Agreement is not enforceable

for any Citi Trends SM who signed the Agreement during the ADR roll-out from approximately

June to September 2012 as it pertains to participation in this case. The court will file an order

simultaneously to this effect.

      DONE and ORDERED this 29th day of May, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE